Good morning, your honors. I'm Stuart Miller for the appellants. I'd like to reserve five minutes of my time for rebuttal. Okay. Watch yourself on the clock there. Yes, sir. I plan to address two issues this morning, vagueness and restraint on expression. The definition of adult cabaret dancer for our purposes has five elements, the last four of which we challenge as vague. These elements are a performer in an adult cabaret who performs a sexually oriented dance that on a regular basis and on a substantial basis focuses on or emphasizes her breasts or buttocks. The basic rule that we derive from the Supreme Court's decisions in Free Speech Coalition and Morales, and from this court's decision in Tucson Women's Clinic, is that violation of an ordinance cannot be a function of the subjective viewpoints of others. In this case, Corporal McPhail, who is the city's chief enforcement officer in charge of undercover operations at the Taboo Theater, has testified that these four terms are, quote, vague, quote, in the eye of the beholder, and depend not just upon the objective actions of the dancers, but upon the observing officer's predictions of what she is about to do in the future. He also testified that other officers will disagree with his interpretation, so that different officers in the audience will have a different conclusion as to whether the dancer in question is an adult cabaret dancer or not. And the city has provided no guidance to its officers in interpreting this ordinance, so there is certainly a likelihood here of arbitrary enforcement. Didn't he, just to confirm my recollection, right or wrong, didn't he though at the end say that if you parse it, he will acknowledge that there are terms that he considered vague or imprecise, but that overall, when you take them all together, he felt that he thought that there was sufficient particularity there? Yes, he did. And that makes things worse, Your Honor, not better. Why is that? Because vagueness to the fourth power is not clarity. He said in that passage that I don't know what fourth power means here. In other words Do we look at the entire list of criteria to decide whether or not that's what an informed person would look at and decide whether or not it's vague? Yes, for two reasons. First reason Is that the first power or the fourth power? Well, that's a separate question. Fourth power meaning four separate elements. Now, it's a basic principle of statutory construction that when you've got a definition with elements, each element has to have a separate significant meaning. So that's number one. So these dancers think that there are these four elements they have to satisfy in order to come within the prohibitions of this definition. And so if those elements don't mean something, then this is just a trap for them because they think that there's something that modifies their conduct to protect them, and there isn't. But isn't the analysis, what you're arguing to me sounds like a divide and conquer analysis, but Corporal McPhail's testimony, and I think I understand Judge Fischer's question, is the same one I have. If you put all those factors together, can't you conclude in as objective a way as English words can describe that this particular entertainer is an adult cabaret dancer? No, we cannot. That brings us to the second reason, which was In other words, but let me finish the question. In other words, we look at all of the factors considered together as opposed to isolation, which is what I hear you urging. Now, sir, here's why. Because he can't articulate what any of them means or what they mean together. All he has said is, I don't know what they mean, but I know one when I see one. Well, it's a little bit. Wasn't that Potter Stewart's definition of obscenity? That's right. But this isn't obscenity. This is fully clothed, no contact dancing. And there's a big difference between knowing obscenity when we see it, knowing nude dancing when we see it on one hand, and knowing sexually oriented clothed dancing on the other. So the second reason is this. There has been prior litigation between these two parties involving an earlier version of this ordinance, and that ordinance only had the first of the five elements I enumerated, which was a performer at an adult cabaret, and it imposed a distance requirement on performers. The state court of appeal ruled that that was unconstitutional. As a result, the city enacted the new ordinance adding these four elements. If those four elements don't add something specific that we can understand, then we're back where we were before with an ordinance that's already been declared unconstitutional. But does this stand or fall, then? We don't apply our own judgment looking at the ordinance and decide whether it's vague. We're bound by what McPhail said? I would use a word somewhat less extreme than bound, but I think we're certainly influenced for a number of reasons. Heavily influenced? Heavily influenced. For one thing, the Supreme Court said in the Hoffman case that an enforcement officer's testimony is relevant in interpreting the vagueness of an ordinance. Now, he's not just an enforcement officer that we chose. He is the head of enforcement. He has supervised some number, something like eight different officers in undercover operations here. Plus, he has testified not just that it's his opinion, but that others will disagree, and that the city has provided no guidance. Now, no case. The city has cited no case. The district court has cited no case dealing with a term such as a sexually oriented dance in anything other than a completely sexually explicit context. No one knows what this means. We don't know. These dancers have to know how to avoid being adult cabaret dancers because the essence of their performance is the proximity to the patron. It's not the wiggling of hips or whatever it is that the city is concerned about. So this comes into play, does it not, if they transgress the two-foot limit? Otherwise, there's no problem. Right. But the problem is that they have to transgress the two-foot limit. Maybe the transgress is not the right word. They have to come within two feet of the patron to communicate this essential message that they're trying to convey. And you're saying, I thought we had dealt with that argument and rejected it in our prior cases where we've upheld ten-foot rules, that while there might be a minimal impact on the conveyance, it's okay because the message can still be conveyed. It's just that it can't be done within two feet. Those cases have all dealt with nudity, and many of them have dealt with actual groping, with the actual physical contact between a patron and a nude dancer. You're not answering my question. My question is, why aren't we bound by our precedent which has rejected the argument that you are now making again, which is that somehow the form of expression has to involve very close proximity of the dancer to the patron, and that this ordinance infringes upon the ability to convey or transmit that message by limiting the distance to no closer than two feet? Because the issue is not the form of the message. It's the content of the message. Let me elaborate on that. But I guess what I'm having a hard time understanding is... Those cases all involve nudity, right? Those cases involve nudity, and many of them involved actual groping. This is different. There, the only message that anyone articulated was the actual, the sheer visual impact of seeing a nude person close up. And the Court held that that... The question that that message can't be conveyed by a minimally clothed dancer, as I understand the record, we're talking about opaque materials. We're talking about very small costumes worn underneath those materials. And I'm having a hard time understanding why that is such a distinguishing fact from nude dancing. First of all, let me explain what the costumes are, and then let me turn to the content of this message. These women wear, as the District Court said, typically tops and miniskirts or, at an absolute minimum, a bikini. They don't wear G-strings and pasties. They have to cover the entire area of the breast from the top of the areola, so they don't wear just pasties or minimal bikinis. They wear normal bikinis that one sees every day, that I see every weekend on Main Street and Huntington Beach. The content of the message is very different from the ones at issue in Kent, Kev, and so on. The message here is one of concern, compassion, understanding, and so on. This is an emotional connection that these dancers make with the patrons. Here's how this works. We are in a crowded and somewhat noisy environment. The dancer initiates her contact with the patron, or the patron initiates it, by requesting a dance. This breaks the ice. They talk during the dance. Now, under the... Dance is a euphemism, though. Does the patron actually stand up and interact? No, it's a performance. The patron sits. Right. So it's a performer. It's a dance performance. Shall I dance? Would you like me to dance for you, is the type of question that the dancer will ask. Would you dance for me? Right. Two feet is kind of a misunderstanding, because she has to maintain two feet at all times. She's dancing. She's moving. If she extends her arm, her hand can only be two feet from the patron, which means that her torso, and most importantly, her face, is five feet away. Now, it's important for her to be closer, because there is... I don't get the five. How do you arrive at five feet? Well, if her arm, if the distance from her fingers to her face, to her neck, is two and a half feet, we're something like five feet away. There's a continual exchange of visual and auditory cues during this dance, which is just the opening part of this encounter between these two people. Mr. Miller, this is the same argument that was made in connection with the Colocurtio and the 10-foot case. Maybe I got the case wrong. But the 10-foot case, in fact, I think it involved the same anthropological expert, if I'm not mistaken, that you relied on in the district court. And I don't understand why we're not bound by our prior precedent that has essentially rejected this argument. Because, well, first of all, the fact that the same witness testified there does not mean that she said the same things here, because the message is completely different. There you're dealing with a completely nude woman lying on a stage. The question is, is the testimony different? As I understand your argument, you're trying to distinguish your case based on nudity versus less nude. And I don't... I think that's the thrust of your argument, because I don't understand how else we can distinguish the holdings of those cases and why we aren't bound by them. Because in those cases, the only message identified was the actual spectacle of the human body. Here, as I've said, we initiate this encounter through this dance in which the dancer is trying to fashion her performance to the desires and interests of... Is it your position that the performance here is different than the performance in those cases? Boundary. Okay, you're going to have to explain to me how that is, because I'm a little skeptical based on the record that I've read. I'm trying to... Go ahead. Yes, Your Honor, but the dancer, as I've said, is trying to create an emotional bond with this patron. While she's dancing, she's talking to him. Typically, what will happen after the initial dance is that they will then sit and they will talk. And they talk about his problems, about his interests, about... She tries to demonstrate compassion for him, attraction for him, whatever it is he seems to want. These dancers are akin to geishas. They're trying to deal with these men one-on-one to have an emotional bond with them. They've testified to this. How is this different from the dances that were performed at the Dream Palace, in the Calacurchio Clubs, in the Kitsap County Clubs? It's essentially the same physical concept of conduct, I guess is the best way I can describe it. I don't understand why it's different in the Taboo Theater from any other adult nightclub in the Ninth Circuit. Because first of all, Dream Palace was not a distance case, Your Honor. I'm not talking about distance. You're talking about the dance, the performance. You don't want to call it a lap dance. I understand that. I'm trying to avoid using that term because I realize it may be pejorative, but I'm asking you how the conduct by the performers at the Taboo Theater differs from the conduct that we have previously examined in our published cases. Because the conduct here is direct and continuous communication, one-on-one between the dancer and the patron, about the dance, about the patron. It's different. It's no different here than it is in any of those other clubs. The regulatory approach may have been different. In some cases, as I understand it, the legislature of the county or the city tried to outlaw the clubs entirely. Then when the court struck those regulations down, they came up with the distance limitation. But the conduct, the performance, as you describe it, of the dancer, to me, is no different from one to the other. Well, there is a big difference, Your Honor, between clothed dancing and nude dancing. This is a completely clothed performance with no physical contact. That doesn't go to conduct. That's attire. I'm sorry, sir? That's attire, not conduct. The conduct is the same. The conduct may be the same in that they're both dancing, but those cases turned on the fact that there was no impediment to the communication. Those cases, Kent said, for example, that there's no problem communicating this message at a distance of 10 feet. We have a profound problem communicating our thoroughly different message at a distance of 10 feet or a distance of two feet. OK. Can can I ask you to turn shift over from into the overbreadth kind of context? I'm because if we can step back a bit, what is it besides these performances that you're describing that this statute or this ordinance would reach? What is it that you find to be overbroad or beyond the pale in this ordinance? This definition is so broad it can encompass a wide variety. Give me an example of Presley. Why would that be? He generates his hips back in the 1950s. He was called Elvis the pelvis. No, just a minute. They see all that argument to me is has a gap in it because you're talking about vagueness in a definition of something that's not prohibited. All the cases that you rely on in terms of vagueness are vague in the definition of prohibited conduct. Nothing prohibits, you know, the Elvis Presley type of dancing. Maybe if you tried, you know, because the prohibition is only in the two foot rule. Right. It's not, you know, all these problems you talk about in definition are not. But we have any conduct. But we need to understand who is subject to the two foot rule. Well, OK. Is it Elvis perform in an adult cabaret club with nudity on stage? Did Elvis perform in a cabaret club that would like a Las Vegas show with breasts bared in the run up to his act? Is that what you're saying? So therefore, that type of if he performed in that kind of a nightclub or whatever, he would be subject to this ordinance. I don't know if he did or not, Your Honor. Well, I mean, would he have to? Because I'm looking I'm looking for under this ordinance. Who is the paradigm? What is the paradigm other than the putative lap dancer that is in everybody's mind? And that would be swept up by this ordinance. Can you give me one example? And Elvis doesn't seem to cut it. This could apply to someone dancing the tango. Someone dancing that is Dr. Hannah said someone dancing the Charleston. It could cover almost anything, because, as Dr. Hannah has explained, almost any dance seems to have an erotic element. And so we don't know when we're covered by this or not. The point is that we need to know how to avoid being adult cabaret dancers. The purpose of this performance, the thing that that customers want is proximity to the dancers so they can communicate. And the dancer, as I said, breaks the ice by doing this performance for the for the patron. We can modify that performance, but we need to understand exactly what it is. But proximity is the easiest part of the ordinance. That that is the most objective factor. We can literally measure it with a tape measure. That's right, Your Honor. But as the State Court of Appeal ruled in the earlier ordinance, we can't have we can't have a prohibition against proximity with performers. We have to narrow that down. Our concern is that we need to have proximity, not that we need proximity to communicate. So you agree that there that the no touching rule is enforceable, even under your theory of what they're doing? We're not challenging. OK, so the question is zero or one inch to some distance. So you're saying what is the distance that they can legitimately regulate to allow the content to be communicated that you're arguing for today? How close do they have to get without touching? They should be able to get as close as they want. No, not as close as they want to, because you just told me they can't touch without touch. OK, so what's how close is that? No, no, there can't be any limit. In other words, so what you're arguing for is that all they can have is a no touching rule. That's right. OK. Do you want to say the rest of the time? Yes. May it please the court, counsel and Deborah Fox for Appellee of the City of Alhambra. I thought I would start by offering some brief comments about the vagueness in taking issues that were briefed here and then focus what I thought the crux of the issue, a new issue for the court is filling in the gaps in the aftermath of Alameda Books. It seems to me that this case is really rather unremarkable, even despite the best and the appellant to make it different. It seems like we're almost 20 years later having another look at Kev versus Kitsap. Well, it is different. I mean, these dancers are clothed. There's no alcohol served. I don't think it is a difference that has a meaningful distinction under the law. If we look at the. What is the evidence that this is the kind of behavior that the secondary effects are concerned about? Well, the behavior that we're concerned about is getting individual dancers within touching range. Why can't you disenforce the no touching rule? Well, that's because you need the line of sight for law enforcement. I think this very court recognized that in the city of Kent case. Then you don't get into that dispute about did they touch? How close were they? But the city of Kent talks extensively about the need to keep people out of earshot so they can't communicate to negotiate for narcotic sales or illicit sex transactions. That's precisely the concern here with the close proximity. And so basically, this is a straight out prohibition on speech on communication, communication at all. Well, you said out of earshot, so they cannot talk. In other words, they can talk, but they're trying to preclude them from talking in the heat of the charged environment to to arrange for illicit sex or drug transactions. So how does that what's the evidence that two feet accomplishes that? Ten feet certainly does. Well, the evidence that it accomplishes that the city relied on this very circuit's decisions. You can see it. Well, I understand what it did. It did a very good job of putting a paper record together. I'm still trying to understand what the factual differences signify here. You've got clothed dancers. There's no nudity. They're outside the by the ordinance's own definition. They're not engaging in any of the prohibited sexual activity that's covered elsewhere. So what this is is carving out a part of conduct which is clothed. There's no alcohol served, which is one of the factors that are cited in the secondary studies is the nature of the surround and the people are getting drunk and the like. So you have no alcohol and you have someone who's standing within two feet and you're telling me the two feet is to keep them from engaging in conversation. It's now what I'm well, yes, you are, because you're telling me what the content of the conversation is. But to make that work, you have to prevent the conversation. Correct. We have to prevent them from being close enough in that charged environment. What the record establishes that these dancers are totally nude on stage. Yes, they come off stage. They don minimal clothing. It's not like they get fully dressed or tired. Are they any more unclothed than they are? People are on the beach. They are. It depends on which beach. Well, let's take Venice Beach, Hermosa Beach, apparently Huntington Beach. Not quite. This is a serious question. I mean, people as minimally clothed on the beach as you would find as they don their minimal clothing and go off stage. But you won't have seen those same people totally naked on stage showing all of this specified anatomical parts and specified the human body. OK, we know that what's going on here. So we don't have to get euphemistic. I'm still trying to understand what is it that the city is trying to prohibit and how. And you're telling me that the two foot rule is to prevent touching because you want line of sight. And now you've also said it's to prevent speech so that they cannot talk in that charged environment. It's not so that they cannot talk. They can certainly talk after the dance is over. We've said that in our brief. If they want to, they can. So if she stops. So in other words, if she does her whole routine and then she's done and says, OK, I'm done. And then they can sit down next to each other and they can do whatever they want. They could once the performance is over. So it's only during the performance. So if they wanted to negotiate, if your theory is correct, this gentleman has been fully aroused by this performer performing nude on stage. She comes off stage, stands in front of him for whatever period of time, 60 seconds, makes the personal connection, stops the performance, can sit down next to that patron and negotiate whatever she wants, drugs, sex or whatever. Is that what you're saying? We do not prohibit conversations after the conclusion of the performance. That's correct. I think the city has a reasonable basis to believe that it should try to put some sort of modicum of tempering on that environment. We certainly have tried. And in fact, you can see from the record, we had a definition that mirrored the city of Kent and Tilly B versus Newport Beach. The Court of Appeal in the 4th District said it was too broad. So we narrowed it down. Now, speaking of that narrowing down, respond to Mr. Miller's argument that the narrowing down itself really doesn't add anything because it's so vague. How does it how does it how does the narrowing work in terms of does it does it really narrow? Well, the narrowing works this way. The 4th District Court of Appeal said that our original definition, which simply said that any nude entertainer could not be within, at that point, I believe it was a four feet, that that could encompass a performer of a baggy pants clown. We wanted to make it clear that this is not a regulation on baggy pants clowns or magicians or those who might want to hand out political buttons. This is what the 4th District said. I find it to be rather ludicrous in the analysis under Broderick. But nevertheless, we try to do and be in keeping with the court's dictates to us. So we made it specifically. We're talking about an adult cabaret. We can't lose sight of the adult cabaret for these adult cabaret dancers. It's in the chapter on adult uses. You have to be an adult cabaret dancer. All of these dancers perform on stage totally nude. There is no question that they are within the ambit when they come off that stage. The cases offered by Appellant, Morales, the free speech case, those all had some sort of subjective issue, whether you were lordary, whether you had an apparent purpose. This does not have that. I would also offer to the court that in the cab case, that case was actually dealing with a non-alcoholic topless facility. And in that case, the court had no trouble with that definition of a neurotic dance. All right. Suppose that what they do is they come off the stage. They don a tango outfit, as counsel suggested. And what they are doing is dancing the tango. They put on tango music. They do just do the tango. Am I to assume when they dance the tango, I've always seen the tango dance with a partner. Okay. Can they dance with a partner? So then we would look to the definition and see whether or not they certainly qualify. They're an adult cabaret. They have as well performed as an adult cabaret dancer or a stipulated. So now the only issue is whether or not in that performance is a tango dancer. They are in fact performing and showing there's focusing on and emphasizing their specified anatomical part. I mean, like, what does a tango dancer do? Does the tango dancer have any emphasis on breasts or buttocks? And I have not I would not say that that would be a subjective decision. But certainly these issues of vagueness you don't look for. It's reasonably intelligent and you don't look for ludicrous examples that never have occurred and are like unlikely to occur in such a setting. Well, wait a minute. Why is that? So these people you're saying that they can do this. But they can do it outside of two feet. So you're not prohibiting the conduct. All right. So we know what the context is. We know what we have some common sense idea of what brings people to this kind of environment and who's performing. The question is whether or not the dancers, the performers can conform their conduct so that they don't violate anything. And it is it is it simply that they stay outside the two foot limit and therefore avoid the questions. Or if they happen to step across for some reason, their hand extends into the forbidden area. It come then the question is whether they've committed an offense turns on the content of what they've done. That's why the tango, which doesn't seem to be totally absurd if they're trying to perform their behavior, would fall within this or not. Well, when we're looking at this issue, if in fact they come within the two feet as well, you know, what what is the remedy there in this particular issue? We don't have a criminal penalty if they if they in fact that occurs. The only remedies are civil penalties and potential revocation of the license of the facility. So I think that puts them out of business. Well, it makes certainly it makes the distinctions again for Morales, where they said, hey, the folks don't know on the streets of Chicago what they're supposed to do. If in fact you tell them to disperse. Well, the First Amendment doesn't protect just against criminal punishment. So let's just explore it here. I take your point, but I'm still curious. That's why I asked the question of counsel for Gamma here. I'm trying to understand the because you're talking about us filling in the gaps and I'm trying to understand what gaps you're asking to fill us to fill in from Alameda books because the gap that gets filled in in this case then becomes the next waypoint for someone who wants to push the line a little further in restricting speech. And you've already said, well, we're trying to prevent speech here. They can talk after, but we don't really want them talking during the performance. So what kind of performances are you also trying to prohibit? And you're saying you can't tell us whether a tango would necessarily fit within it or not. Is that your answer? Your Honor, I may be getting confused. I don't think I've answered the question well. I am offering for filling in the gaps of Alameda books that it seems to me that this is the time, place and manner of how you examine the issue of the sufficiency of the findings of the legislative body. Justice Kennedy had some thoughts about what time, place and manner means in this context. So let's just, if you can help me understand what you think this ordinance reaches and then we'll figure out whether or not it's time, place and manner or whatever it is. Does or does not something like a tango, in your view, fit within this or the Charleston, if you like that better, or an Elvis Presley type of routine? I do not see those as fitting within this because they do not appear to me to fit the definition that they are not individuals that are, in fact, on a regular and substantial basis, focusing or emphasizing the adult cabaret dancers' breasts, genitals and buttocks. So if she stood up there and deliberately emulated an Elvis Presley performance, that would or would not, in other words, she says, I'm going to, I will do my Elvis Presley interpretation here. If you're, if you're offering air guitar and that kind of thing. OK, we're offering in this hypothetical that the totally new dancer is now going to come on stage and don an Elvis Presley costume. Well, an imitation of a very, you know, she's got a couple of spangles and it's no question that she's. But what she's doing is emulating. It ain't nothing but a hound dog or something like that, gyrating around with that fall within the prohibition. I don't believe so. Well, well, even if it did, it only would if it's within two feet of the patron. So up to that point, it permits that kind of performance. And I don't know if Elvis would make the argument that I have to be closer than two feet to. Well, for all we know, Elvis will come back and tell us to fully engage. That's the reason I mentioned it, to fully engage in, you know, in my artistic expression. Well, it's certainly we've raised in our brief as well some issues about whether or not there is any protected First Amendment issue at play here. And there's no protection. I don't believe in lap dancing. And that's really what this is about. The reason that we. Well, but why? Wait a minute. Lap dancing. Council has conceded that you can have a no touching. So you can't do lap dancing without being on the lap or near the lap. Correct. I'm not sure if he has conceded that. When you ask that question, I think that the response was we haven't put that at issue. So I'm not sure that they have conceived. Well, they went out of pains in their briefing to say this isn't about lap dancing. So let's assume that in any event, the two foot rule would preclude lap dancing. The question is what it sweeps up at the same time. What else does it reach by creating the two foot barrier? I don't think. I'm sorry, Your Honor. I'm sorry. You say this is about lap dancing. They say it's not. So if it's it simply puts a two foot. Are you. If he concedes that lap dancing is not in and that you can absolutely constitutionally reach lap dancing, does that obviate the need for this two foot limitation? And that main issue is the line of sight and enforcement. And we offer that citation to the deposition, a transcript of Lisa Heap, who was the development redevelopment director, talking about the need for the police enforcement to have that line of sight. And that's really what's key here. And that's what's driving the whole train. Otherwise, we could have been clever and simply gotten rid of it and said there's a no touch. But we felt strongly the city had a reasonable basis to believe that it was that they needed that two foot. I mean, every other case we've relied on 10 feet, six feet. Okay. Can I understand? And you've done. I didn't mean to be facetious about it. I think the city did a very good job of documenting its purposes in that documentation. What is the case that is closest to the facts of this case? Two feet, fully clothed, not nude, not engaging in any prohibited sexual activity, which is a defined term under the ordinance, and no alcohol. Any studies, any cases that have dealt with that kind of situation? I'm sorry, I don't know, Colucheo versus City of Kent? I think it's called Colucheo. No, I can never pronounce the plaintiff's name. They're pretty well known. We've had them before our court many times. Yes, I always call it City of Kent. It's either dancing or taxes. That seems to be their problem. And I would offer to the court that in that particular case, the prohibition of the 10 foot rule, again, was on no dancing. It didn't take issue with the nature of the attire at that 10 foot limitation. Well, isn't that the point? That was nude dancing, wasn't it? It was all dancing. No dancing or entertainment, both as well as in Kitsap. Well, wait a minute. That was, City of Kent was nude dancing on stage and personalized table dances. Nude. But the prohibition in the City of Kent said no dancing or adult entertainment may occur within 10 feet. Well, but the case involved nude dancing. Where is the case that deals with non-nude, where the people have tried to, as the city has tried to conform its ordinance, on the other side of the equation, the folks who are trying to live within them try to conform there. So they deal with these variables. Where, where is the one that says once you put clothing on and remove the nudity, that you're within, you're still within the enforceability side of things. I don't believe that the case has been drafted. The cases that are offered have given that that specific issue about the attire. While it is generally we deal with what's put before us. Correct. And that's a problem on over reading cases. If the case didn't present the facts, it's a little tough to rely on them to have decided the issue unless they reach out explicitly to do so. So that's what I'm trying to find out. Your, your, your closest case, though, I think is the Kent case. Yes, I think so. OK, that's helpful. If I might speak briefly in my remaining minutes to the issue of Alameda books, I really thought that was the key issue here. And that particular case, I think it's important for guidance for all of us municipalities who are trying to do our job here. That case talks about the fact that really shoddy data just isn't going to get the job done. In this particular case, the offerings by the appellant have not cast any direct doubt on the basis of the city. The city's basis was very strong. Most specifically, and I guess most uniquely as compared to all the cases across the circuit, we had specific reports that were in the records, vice reports about the activities at this facility. So we had a reasonable basis to believe we needed a proximity to stop these activities. I mean, we have some very salacious things going on. We have insertions. We have all sorts of touching, et cetera. And that is found in our studies, et cetera, excerpts at 1065 to 3125. We also had vice reports from sister jurisdictions. We had extensive findings. We were reading and trying to understand the rulings of this particular circuit. I would offer that the Maricopa County case, I think, is very much in our favor as well. That particular case talks about it. It's appropriate to look and compare the evidence to the evidence in other cases. We compare very well with the GM Enterprises versus the city of St. Joseph, along with the Maricopa case. And as well, I would offer that it seems to me that this particular case helps complete the picture of how you do deal with the time, place, and manner restrictions after Alameda books. First, we had Maricopa County at the time. Now we have worldwide video at the place. And finally, I think now we have it the manner with the city of La Habra. And I would urge the court to reaffirm the decision of Judge Taylor. Thank you. I'll give you two minutes for rebuttal. Two minutes for rebuttal. I'll have to speak very quickly then. First, as Dream Palace held, this is not a time, place, manner restriction. Rather, it's a ban on message. Dream Palace said so with regard to a limitation on the movements that a dancer could make. And here we have a restriction that only applies when the dancer is not dancing. In other words, when she's not engaged, it only applies when she is dancing. So we have a restriction that does not preclude proximity between dancer and patron. It only applies when the dancer is actually engaged in fully protected First Amendment conduct, returning the First Amendment upside down here and limiting the actions of the performer only while she's actually expressing herself. The line of sight argument makes very little sense because the distance requirement is not in effect when the dancer is not performing. She can be next to the patron. And even though this doesn't happen at our club, the ordinance permits her to touch him even to kiss him. So this line of sight argument does not justify this truly unusual ordinance. Under Alameda Books, first of all, the city's assertions that all these vice things happen at the club are very, very hotly contested. We are at the summary judgment stage here. We presented detailed declarations by club managers, by the dancers, saying that these events do not happen.  There's never been a single conviction for drug dealing at the club for any of these other things. Mr. Miller, if the city is entitled to rely upon vice reports from conduct that has occurred at other clubs, which have been before this court, I don't see how your situation is distinguishable from those. I don't think we need to resolve the question of whether or not this conduct did or did not occur at the taboo theater. I'm still, I guess I'm still hung up on the question I asked you earlier, which is I just don't see how this form of dance differs from the dancing that we've had before the court in any number of these cases. Yeah, I think Your Honor's question raises actually three points. Let me answer those and then I'll stop. First on Alameda Books, there were two issues before the district court in Alameda Books. The first step in which the city has to present evidence to support its ordinance than our burden to rebut. The city presented no evidence, not even an articulated theory unbacked by evidence for an ordinance that supposedly reduces secondary effects by prohibiting proximity between patron and client only, between patron and dancer only while the dancer is performing, but doesn't prohibit proximity momentarily as soon as the dance is over. Second, if they've met that burden, we then have the opportunity to rebut it by actual and convincing evidence. Now we've presented more than a full volume of that record, taking apart these city studies, presenting studies of our own based upon field data generated elsewhere in the country and within the city of Le Havre itself. This is a summary judgment that we're at. The question is, have we even put a fact in issue? And if we haven't put a fact in issue, then Alameda Books means nothing because we have done a more thorough job, a more ambitious job, a more comprehensive job than any plaintiff has ever done in any other case dealing with adult uses. And at the same time, we have a more modest type of conduct than anyone else has in any other case because, first of all, we're fully clothed. Second, even if you can Kennedy. We know the facts. Okay. Okay. And then the third point is dealing with Calacertio and those other cases. Here's what those cases said. BSA said the plaintiffs failed to explain how the distance requirement impinges on their First Amendment rights. That's a quote. We have explained that. There was no allegation that the distance between entertainer and patron is an integral part of the expressive activity. That was BSA. We have explained how it's an integral part. In Kev, the Court said the ability to engage in protected expression was not significantly impaired. The expression there was the sight of naked breasts. That's not what we're asserting our message is. And then in Calacertio itself, the plaintiffs argued that nude table dancing, this is a this is quote, and this is very important wording, was a unique form of expression. We're not dealing with form. We're dealing with content. And the Court analogized the point made by the Kent plaintiffs as saying that message bearing raviolis or speaking in a Donald Duck voice. We can read the cases. I think we have every point. Thank you very much. The case just argued. We appreciate the arguments in the cases. Thank you. The case just argued is submitted and we'll move next to United States versus Edwards.
judges: Tashima, Fisher, Tallman